IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

MIKE NOBLE, Individually and            )
                                         )
On Behalf of All Others Similarly Situated,  )
                                         )
                            Plaintiff,   )
                                         )        CIVIL ACTION NO: 3:08- cv-76 DCR
v.                                       )
                                         )
SERCO, INC.                              )
                                         )
                            Defendant.   )
.

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR NOTICE TO
POTENTIAL PLAINTIFFS AND CONDITIONAL CERTIFICATION**

This is Defendant Serco Inc.'s response in opposition to Plaintiff's Motion for Notice to

Potential Plaintiffs and Conditional Certification.  Serco opposes Plaintiff's motion for two

straightforward reasons: (1) a victim of his zeal to obtain conditional certification, Plaintiff has

failed woefully to introduce evidence that would sustain his burden to prove that he is similarly

situated to the potential members of the putative Fair Labor Standards Act ("FLSA") collective

action class he seeks to represent; and (2) due to the diverse nature of the putative class and the

applicable defenses, this action would be unmanageable as a collective action.

Plaintiff has submitted no evidence beyond the allegations in the Complaint and four

inadmissible cookie-cutter declarations of other military recruiters to show that he is similarly

situated to the hundreds of others military recruiters he seeks to conditionally certify as a class.

Plaintiff has not, and cannot, meet this basic preliminary requirement for conditional certification

for the following reasons:

a.      Serco's recruiters[1] were assigned to work pursuant to one of five distinct and distinguishable government contracts;

b.      Serco's recruiters were assigned different roles and responsibilities;

c.      Serco's recruiters were paid pursuant to different compensation plans;

d.      Serco's recruiters worked in approximately 175 locations in more than twenty-five states and territories, and many cities;

e.      Serco's recruiters worked in a variety of markets across the country;

f.      Serco's recruiters worked in a variety of different office structures;

g.      Serco's recruiters worked under loose supervision and determined for themselves how to execute their jobs;

h.      Serco's recruiters worked in at least six distinct positions, including an entry level position, supervisory positions, and a managerial position;

i.      some of Serco's recruiters would be in conflict with others because they worked in roles that were either subordinate to or supervisory over other potential putative class members; and

j.      Serco's recruiters worked varying hours.

Taken individually or together, these differentiators illustrate the fact that this case is inappropriate for collective action treatment.

They also confirm the fact that collective action treatment would be unmanageable in this case because this Court would have to examine the duties of each potential member of Plaintiff's proposed putative collective class to determine if he or she – as influenced by these numerous differentiators - was covered by one or more of the FLSA's white collar exemptions from

---

[1] Defendant refers to the putative class members as "recruiters" for this Court's convenience, but as noted throughout this brief, the duties potential putative class members performed varied based on a number of factors and extend beyond the generic uniform title.

overtime (29 U.S.C. § 213(a)(1)).  Defendant classified the employees at issue as exempt.  This Court's ability to determine the application of those exemptions categorically across the disparate potential putative collective members would be thwarted for the reasons listed above.

If Plaintiff had not rushed to file his motion and had instead followed the deliberate process approved by the Sixth Circuit Court of Appeals and by other judges in this District,[2] Defendant and this Court could have avoided the waste of resources and time caused by Plaintiff's woefully deficient motion.  For the reasons described in this Opposition brief, Defendant requests that this Court reject outright and with prejudice Plaintiff's premature and unsupported request for conditional certification and notice.  Alternatively, and at the very least, Defendant requests that the parties be permitted to take discovery in accord with the process approved in this Circuit for ensuring that conditional certification is granted only in appropriate cases.  *See, e.g., Comer,* 454 F.3d at 546.  And given the haste-driven deficiencies of Plaintiff's submission and his clear disregard for this Circuit's procedure and preferred timing of filing a motion for conditional certification, the statute of limitations should not be tolled should this Court grant Plaintiff's motion.  *See* Defendant's Opp. To Expedited Motion To Toll Statute of Limitations (Dkt. 39).

---

[2] *See Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006) (approving district court's bifurcation order in putative FLSA collective action that required discovery regarding conditional certification before plaintiffs filed their motion: "The district court's order bifurcating discovery was consistent with the approach typically used by courts in suits filed under 29 U.S.C. § 216(b)."); *Crawford v. Lexington-Fayette Urban County Gov't*, No. 06-299 JBC, 2007 WL 293865, at *5, 6 (E.D. Ky. Jan. 26, 2007) (citing *Comer* and relying on named plaintiffs' deposition testimony to determine propriety of conditional certification); *Jones-Turner v. Yellow Enter. Sys., LLC,* No. 3:07-CV_218-S, 2007 WL 3145980, at *2 (W.D. Ky. Oct. 25, 2007)(relying in part of "testimony of past and current employees" to justify conditional certification of FLSA collective action).

If this Court grants Plaintiff's motion in any respect, then Defendant requests that it be provided an opportunity to negotiate with Plaintiff regarding the form notice and consent form that he submitted with his motion.  Defendant objects to the forms that Plaintiff proposed, as well as to the contents of those forms.  Additionally, in the event that it authorizes collective action notice, Defendant requests that this Court order Defendant to disclose employees' contact information to a third-party administrator, rather than to Plaintiff's counsel.  Plaintiff has shown no need to see such information and should not object to this request, so long as any approved notice is distributed under this Court's authority.  Plaintiff has argued, after all, that it is the notice that is important to him.  He should not be troubled if that notice is distributed by someone other than his attorneys.[3]

## DEFENDANT'S OVERVIEW OF FLSA LITIGATION

This Court may be aware that the federal courts have been flooded with putative class and collective actions filed under the FLSA.  Collective action claims to recover unpaid overtime presently outpace all other employment-related claims for class action relief.  A number of courts across the nation have openly expressed concern about the trend, and have acknowledged that putative mass actions are often brought in the interest of leveraging hefty settlements from well-meaning defendants despite the merits, or lack thereof, of the individual plaintiffs' claims.  It is a concern echoed by the Supreme Court in its decision in *Bell Atlantic Corp. v. Twombly,* 127 S.

---

[3] Defendant anticipates that Plaintiff will argue that this request is unreasonable and unnecessary. Defendant's counsel responds, respectfully, that he has recently encountered outrage from employees in other cases whose personal information was published directly to plaintiffs' attorneys.  Such instances have caused the parties, counsel, and courts in those cases unwarranted trouble that could have been avoided.  Plaintiff in this case would ultimately learn the contact information of anyone who decided to join his cause.  Until then, the detriment of providing the information directly to his attorneys would outweigh its benefit.

Ct. 1955, 1966 (2007) and by the Third Circuit Court of Appeals in *In re: Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3rd Cir. 2008).

Respectfully, this Court should not permit itself to be caught up in the moment. Without question, there are some FLSA cases that are appropriate for conditional certification. The surge in this type of litigation, however, has unfortunately caused defendant employers to become skittish when confronted with even the most base of class action rumblings. In this case, Plaintiff has filed a conditional certification motion that, at best, recites superficially some of the basic propositions that govern FLSA litigation. Plaintiff's brief is well-written, but it is devoid of substance and rests on four flimsy, practically identical declarations – nothing more. Yet, Plaintiff's submissions to date have caused Defendant to expend thousands of dollars in its response to this litigation. Defendants in this situation understandably wonder whether it would be cheaper to settle plaintiffs' nonmeritorious claims than to engage in prolonged, potentially class-wide battles that are imminently winnable, but ultimately excessively expensive. This is precisely the leverage that has concerned the Supreme Court, the Third Circuit Court of Appeals, and a number of other courts across the country. *See Twombly,* 127 S. Ct. at 1966; *In re: Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310. If this Court conditionally certifies a class based on Plaintiff's superficial filings, that leverage will become almost beyond reckoning. Defendant respectfully requests that this Court help push back the rising tide of unjustified collective action litigation.

## BACKGROUND

### I.     PROCEDURAL HISTORY & ALLEGED CLASS DEFINITION

Plaintiff, Mike Noble, filed this lawsuit on December 18, 2008 on behalf of himself and "all others similarly situated." *See* Dkt. 1. Plaintiff defines the putative class as "[a]ll individuals working as recruiter for Serco, Inc." *Id.* at ¶ 5.13.

On February 2, 2009, Defendant moved to dismiss Plaintiff's Complaint.  *See* Dkt. 19.

Immediately thereafter, on February 10, 2009, Plaintiff moved for conditional certification and

court-approved notice.  *See* Dkt. 21.  On February 23, 2009, Defendant filed an expedited motion

to stay its deadline for responding to Plaintiff's conditional certification motion until this Court

ruled on Defendant's motion to dismiss, which this Court granted on February 27, 2009. *See*

Dkt. 27, 31.  Discovery was also stayed during this period.  No discovery has been conducted to

date.  On June 25, 2009, this Court denied Defendant's motion to dismiss (Dkt. 41.), thereby

prompting Defendant to submit this Opposition in response to Plaintiff's Motion for Notice to

Potential Plaintiffs and Conditional Certification.

## II.   FACTS

Serco is a professional services company.  *See* Swartzentruber Decl. ¶ 4, attached hereto

as Exhibit A.  One of its clients has been the United States Armed Forces, including the United

States Army and the Arkansas National Guard.  *See id.*  Serco entered into contracts with the

Army and National Guard to support their recruiting efforts by staffing their recruiting stations

with civilian recruiters.  *See id.*

### A.   Serco Employed Individuals In Six Different Military Recruiter Job Titles

Serco employed individuals in six different military recruiter job titles: Military Recruiter

I, Military Recruiter II, Military Recruiter III, Military Recruiter Supervisor I, Military Recruiter

Supervisor II and Military Recruiter Manager.  *See id.* at ¶ 5.  A cursory review of the

responsibilities associated with the job titles highlights the differences in duties among these

different types of recruiters.  Military Recruiter I was an entry level position.  *See id.* at ¶ 19.

Typically, after these individuals went through a probationary period during which they received

sales and recruiter training, they were promoted to a Military Recruiter II position.  *See id.*   In

this position, the recruiters worked autonomously and were responsible for developing their own book of recruits to enlist in the armed services. *See id.* Military Recruiter IIIs had a more specific focus. They were responsible for: (1) recruiting individuals from the Navy or Air Force to join the Army after their enlistment period was finished, (2) facilitating the move of a National Guardsman to another National Guard location, (3) transitioning soldiers from active duty into the Arkansas Guard, and/or (4) developing market research associated with their recruiting efforts. *See id.* Military Recruiter Supervisor Is were station managers who also recruited individuals for the Army. *See id.* They typically supervised between two to three individuals. *See id.* In contrast, Military Recruiter Supervisor IIs were also station managers, but because they supervised four or more other recruiters, they were not assigned personal recruiting missions. *See id.* Military Recruiter Managers were in charge of an entire company, for which they set their own standard operating procedure. *See id.* Each company was comprised of five to eight recruiting stations that were staffed by one or more Serco recruiters. *See id.*

Military Recruiter Managers supervised all the lower ranks of recruiters, except for the Military Recruiter IIIs. *See id.* at ¶ 20. Likewise, Military Recruiter Supervisor Is and IIs supervised the Military Recruiter I and II positions. *See id.* Military Recruiter Supervisor Is and IIs and Military Recruiter Managers interviewed recruiter candidates for hire and were expected to make recommendations for hire and termination. *See id.* Their recommendations were always taken into account and typically heeded. *See id.* Military Recruiter Supervisor Is, IIs and Managers had the additional duties of supervising, guiding, training, coaching and mentoring the lower ranking recruiters that worked under them. *See id.* In addition, Military Recruiter Supervisor Is, IIs and Military Recruiter Managers were responsible for evaluating the work of the other recruiters and appraising their productivity. *See id.*

### B. **Recruiters Were Assigned To Work Pursuant To One Of Five Distinct Government Contracts**

The Army maintained more than 1,600 recruiting stations across the United States and its territories. *See id.* at ¶ 6. Serco assigned recruiters to approximately 175 of those stations in over twenty-five states and Puerto Rico. *See id.* Serco's recruiters were assigned pursuant to one of five distinct contracts: (1) the Integrated Recruiter Contract (05040.008), (2) the Integrated Recruiter Contract II (05045.001), (3) the 10 Contract Company Pilot Test (05030.001), (4) the Blue to Green Contract (05040.002), and (5) the Arkansas Army National Guard Recruiting and Retention Battalion Contract (05040.004). *See id.* Each of these contracts has expired. *See id.* Serco has not employed any potential class members since March 2008. *See id.* While active, each contract required Serco to supply the Army or Arkansas Guard with recruiters throughout the United States; however, the conditions of the 10 Contract Company Pilot Test were very different from those under the Integrated Recruiter contracts, which were different from those under the Blue to Green or Arkansas Project contracts.

### 1. The 10 Contract Company Pilot Test (05030.001)

The 10 Contract Company Pilot Test was a pilot test to test the feasibility of substituting civilian recruiters for uniformed recruiters as a way to permit uniformed recruiters to return to their primary Military Occupational Specialties on assigned Army posts. *See id.* at ¶ 10. Under this contract, Serco provided the Army's Recruiting Command with recruiters in thirty-five predetermined stations located in Utah, North Carolina, Pennsylvania and Illinois from May, 2002 through December, 2007. *See id.* This contract was unique because it charged Serco with the responsibility of operating each of these stations in the entirety, and Serco was required to supply all leadership and management personnel for the stations. *See id.* This was unlike the other contracts where recruiters worked alongside members of the U.S. Military. *See id.* at ¶¶ 8-

9.  Therefore, under this contract, Military Recruiter Is and Military Recruiter IIs were

supervised by either a Military Recruiter Supervisor I or Military Recruiter Supervisor II, who

were supervised by Military Recruiter Managers.  *See id.* at ¶ 10.   Additionally, Serco was

responsible for managing the profit and loss of each of these stations.  *See id.*

### 2.      The Integrated Recruiter Contract (05040.008)

Pursuant to the Integrated Recruiter Contract, Serco contracted with the Army's

Recruiting Command to provide it with recruiting personnel from November, 2005 through

November, 2006.  *See id.* at ¶ 8.  This contract was referred to as the Integrated Recruiter

Contract because Serco employees worked alongside uniformed Army recruiters at the assigned

recruiting stations.  *See id.*   Under this contract, there were several different station formations.

*See id.*  Serco's recruiters were either assigned to stations where they worked by themselves or

worked with another Serco recruiter and one or more Army recruiters, or worked with no other

Serco employees and the uniformed Army recruiter.  *See id.*   Serco did not supply recruiter

leadership under this contract, the U.S. Military did.  *See id.*  Consequently, no Military

Recruiter Supervisor Is or IIs or Military Recruiter Managers worked under this contract.  *See id.*

The Military Recruiter Is and IIs who worked under this contract reported to their Serco

supervisor, who typically worked at a distant location.  *See id.*   Under this contract, Serco

supplied the Army with recruiters in approximately 102 individual stations in twenty-four states

across the country, each manned usually by one, or occasionally by two Serco employees.  *See*

*id.*

### 3.      The Integrated Recruiter Contract II (05045.001)

At the end of the first Integrated Recruiter Contract, the U.S. Army contracted with

MPRI, Inc. to fill recruiter positions in approximately 160 stations across the country from

November, 2006  through March 22, 2008.  *See id.* at ¶ 9.  Under this contract, Serco had

responsibility for filling 88 positions in approximately 70 recruiting stations. *See id.* This contract was similar to the first Integrated Recruiter Contract in terms of station formations, except that it governed different locations. *See id.*

### 4.    Blue to Green Contract (05040.002)

Serco also entered into a contract referred to as Blue to Green. *See id.* at ¶ 11. This was a contract with the United States Army's Human Resources Command to recruit airmen and sailors into the Army from the U.S. Air Force and U.S. Navy. *See id.* This contract expired in 2006. *See id.* The similarities among recruiters' duties under this contract, the Integrated Recruiter Contracts, and the 10 Company Contract was limited to the outcome – a soldier entered into the Army. *See id.* These recruiters were working with an already active military population and were recruiting on the Air Force and Navy bases, not in the civilian community. *See id.* Their duties differed from other Serco recruiters due to the population they were serving. *See id.*

### 5.    Arkansas Army National Guard Recruiting and Retention Battalion Contract (05040.004)

Each state has an Army Guard Recruiting and Retention Command whose purpose is to recruit and retain soldiers within that state's Army National Guard. *See id.* at ¶ 12. Serco contracted with the Arkansas National Guard to provide in-service recruiting and to run its interstate transfer site. *See id.* This contract expired in 2007. *See id.* Recruiters under this contract were responsible for confirming assignments and preparing contracts for soldiers moving both into and out of the Arkansas Guard, as well as transitioning soldiers from active duty to the Arkansas Guard. *See id.* In addition, some, but not all potential collective members working under this contract reviewed the enlistments of hundreds of recruits each year for market research and market analysis purposes. *See id.*

## C.  Recruiters Worked Pursuant To Different Compensation Plans

The base pay and commissions structure of the potential putative class members varied depending on each recruiter's job level.  *See id.* at ¶ 21.  Military Recruiter Managers were paid a higher base salary than Military Recruiter Supervisors IIs, who were paid a higher salary than Military Recruiter Supervisors Is, who were paid a higher salary than the Military Recruiter IIs, who, in most cases, were paid a higher salary than the entry level recruiters.  *See id.*  Likewise, the commission structure varied depending on the particular recruiter position.  *See id.*  Military Recruiter Is and IIs received commissions based on their own recruiting efforts.  *See id.*  Military Recruiter Supervisor Is could chose whether to take commissions based on their own individual results or based on the station's results.  Military Recruiter Supervisor IIs and Military Recruiter Managers, on the other hand, were subject to a commission structure whereby they received commissions based on the performance of the station or command they supervised.  *See id.*  Military Recruiter IIIs even had an entirely separate compensation structure based on the contract they served under.  *See id.*

The base pay and commissions also varied per contract.  There were five different bonus plans, one for each contract.  *See id.* at ¶ 23.  Additionally, because Serco was responsible for running each station under the 10 Company Contract, the company managers had more leeway in adjusting pay.  *See id.* at ¶ 22.  Under each contract, different incentives were offered to help meet the particular needs of the Army or National Guard at the time in the particular location. *See id.* at ¶ 23.

## D.  Plaintiff Noble Worked As A Military Recruiter II Under The Integrated Recruiter Contracts In One Location

Plaintiff Mike Noble was hired by Serco as a Military Recruiter I.  *See id.* at ¶ 15.  He began working for Serco on September 11, 2006 under the Integrated Recruiter Contract

(05040.008).  *See id.*  After he underwent seven weeks of sales and recruiter training in Fort

Jackson, South Carolina, he was promoted to a Military Recruiter II position.  *See id.*  At the end

of the first contract, Serco retained Noble to work in the same position under the Integrated

Recruiter Contract II (05045.001).  *See id.*  Noble's employment was terminated at the expiration

of the contract on March 21, 2008.  *See id.*

While working for Serco, Noble was assigned to the Lexington East station, but worked

primarily in a sub-station several miles from the Lexington East station.  *See id.*  The sub-station

where Noble worked was a stand alone location near the University of Kentucky in Lexington,

Kentucky.  *See id.*  The next closest station to Noble's location where a Serco employee was

employed was a state away in West Virginia.  *See id.*  Noble worked alone at the station with

minimal supervision; there were no other Serco employees or members of the Army at that

station.  *See id.*  David Swartzentruber was Noble's supervisor, and he worked 110 miles away.

*See id.*

### E.  Opt-In Plaintiffs Robinson, Smith and Delgado All Worked As Military Recruiter IIs In Three Locations

There are fourteen former Serco employees, including Plaintiff, who have elected to

participate in this action.[4]  The following four individuals signed declaration in support of

Plaintiff's Motion.

---

[4] There are fourteen former Serco employees involved in this lawsuit. Plaintiff has not filed any opt-in consent forms since April 6, 2009. *See* Dkt. 36. Given the disparity and geographic dispersion of the putative class of potentially hundreds of recruiters, this Court should consider whether four declarations and an additional ten other opt-ins demonstrates interest sufficient to establish that similarly situated individuals exist and desire to join this litigation.  *See, e.g., Dybach v. Florida Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991) ("[b]efore determining to exercise [power to order notice to prospective class members], the district court should satisfy itself that there are other employees of the [defendant] who desire to 'opt-in' and who are 'similarly situated'. . ."); *O'Donnell v. Robert Half Int'l Inc.*, 429 F. Supp. 2d 246, 250-251 (D. Mass. 2006)(noting that "plaintiffs have failed to demonstrate any of the putative class

Opt-in Plaintiff Charles Robinson was hired by Serco on October 16, 2006. *See id.* at ¶ 16. He worked as a Military Recruiter II under the 10 Contract Company Pilot Test contract (05030.001) until his termination at the expiration of the contract on December 28, 2007. *See id.* Robinson was assigned to the Wilmington Recruiting Station in Wilmington, North Carolina. *See id.* He reported to William Stewart. *See id.*

Opt-in Plaintiff Johnny Smith was hired by Serco on December 4, 2006. *See id.* at ¶ 17. He worked as a Military Recruiter II under the Integrated Recruiter Contract II (05045.001) until his termination at the expiration of the contract on March 21, 2008. *See id.* Smith was assigned to the Lynnhaven Recruiting Station in Virginia Beach, Virginia. *See id.* Unlike the sub-station Plaintiff was assigned to, the station Smith was assigned to was a large recruiting office. *See id.* There were approximately five or six other recruiters assigned to this station but Smith was the only Serco recruiter. *See id.* The others were Army troops. *See id.*

Opt-in Plaintiff Elvin Delgado was hired by Serco on March 31, 2006. *See id.* at ¶ 18. He worked as a Military Recruiter II under the Integrated Recruiter Contract (05040.008). *See id.* At the end of the first contract, Serco retained Delgado to work in the same position under the Integrated Recruiter Contract II (05045.001) until his termination at the expiration of the contract on March 21, 2008. *See id.* Delgado was assigned to a recruiting station in Puerto Rico. *See id.* He was the only Serco employee assigned to the station but there often were approximately nine or ten other Army troops working in the same station. *See id.*

---

members are interested in joining the suit" and "plaintiffs' personal beliefs, by themselves, are insufficient as a matter of law to satisfy their burden of proof" on this point); *Hargrove v. Skyes Enters., Inc.*, 1999 U.S. Dist. LEXIS 20141 *13 (D. Ore 1999) (declining to conditionally certify class where only 6 people had shown interest in the subject matter of case).

## ARGUMENT

### III.   Plaintiff's Motion Fails Woefully To Establish A Basis For Conditional Certification

The FLSA permits a plaintiff to maintain an action on "behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216(b).  District courts are not required, but have the discretion in appropriate FLSA actions, to regulate the notice, if any, sent to similarly-situated potential plaintiffs.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989).  Court-facilitated notice is not mandatory and should be authorized *only* if the plaintiff has made a sufficient showing that a similarly-situated class exists.  *See Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

#### A.   Two-Step Certification Approach For FLSA Litigation Adopted By Sixth Circuit Courts

In determining whether to allow opt-in notification and certification under the FLSA, courts in the Sixth Circuit apply the "two-step certification" approach originally set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).  *See, e.g., Comer*, 454 F.3d at 556-57.  The court makes its first determination at the notice stage during which the court decides whether a plaintiff has presented substantial, probative evidence that similarly-situated potential plaintiffs exist.  *See id.*

While the required level of proof at this stage is minimal, proof that Defendant had a common policy or plan that violated the law is still required.  *See Brooks v. A Rainaldi Plumbing, Inc.*, No. 6:06-cv-631-Orl-31DAB, 2006 U.S. Dist. LEXIS 89417, 2006 WL 3544737, at *2 (M.D. Fla. Dec. 8, 2006)("While it is clear that, at this [notice] stage, Plaintiffs' burden is not heavy, *it is not invisible*.") (emphasis added).  Courts do not allow plaintiffs to simply rely upon the allegations contained in their complaint and require actual evidence that potential members "were together the victims of a single decision, policy, or plan" that violates the FLSA.

*See Comer,* 454 F.3d at 546 *(*the district court ordered limited discovery, including production of documents, expert witness reports, and small numbers of depositions, to determine whether the suit should properly continue as a collective action); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 896-897 (N.D. Iowa 2008); *O'Neal v. Kilbourne Med. Labs., Inc.,* No. 05-50, 2007 U.S. Dist. LEXIS 22620, at *17 (E.D. Ky. Mar. 28, 2007).

In cases, as here, where plaintiff alleges that an employer misclassified a group of employees as exempt, plaintiff must show that members of the putative class share similar job duties and responsibilities in order to justify collective action treatment. *See, e.g., Holt v. Rite Aid Corp.,* 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) (denying motion for conditional certification and noting that "the 'similarly situated' inquiry in this case must be analyzed in terms of the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt"); *Morisky v. Public Service Elec. & Gas Co.,* 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (denying motion for conditional certification and noting that "'similarly situated' in this case must be analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt."). As explained below, Plaintiff cannot show that he is similarly situated in job duties or responsibilities to the potential plaintiffs.

At the second stage, the court examines various factors, including (i) whether there are disparate factual and employment settings of the individual plaintiffs; (ii) the various defenses available to the defendant which appear to be individual to each plaintiff; and (iii) the fairness and procedural considerations that would make certification improper. *See Lusardi*, 118 F.R.D.

at 359.  During this final stage, the court makes a conclusive determination regarding certification of the collective action.  *See Comer*, 454 F.3d at 546.

Courts carefully consider granting conditional certification at this first stage because they have a "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Freeman*, 256 F. Supp. at 944 (citation omitted).  Courts have exercised caution in granting conditional certification at this stage because the conditional order approving notice is not appealable.  *See Comer*, 454 F.3d at 549; *see also Jackson v. Papa John's USA, Inc.*, No. 1:08-cv-2791, 2008 U.S. Dist. LEXIS 107650, at *14 (N.D. Ohio Feb. 13, 2008).

**IV.**    **This Court Should Not Conditionally Certify This Collective Because Plaintiff Has Failed To Present Sufficient Evidence That He Is Similarly Situated To Other Potential Plaintiffs**

Plaintiff has not submitted the requisite level of proof required to show that he is similarly situated to other potential plaintiffs.  Plaintiff alleges that he and other putative class members are "similarly situated" because: (1) they were misclassified as exempt under the FLSA pursuant to a policy, pattern or practice of Serco; (2) performed the same job duties and were subject to similar work requirements; and (3) worked more than 40 hours without additional compensation.  *See* Plaintiff's Motion at p. 10.  Plaintiff has provided no factual support for these baseless allegations.  In support of his claim that he is similarly situated to others, Plaintiff submits only four cookie-cutter declarations that simply mimic the allegations in the Complaint.  They do not (and cannot, for lack of personal knowledge) provide evidence that military recruiters in other locations, or in other job titles, or working under other contracts were treated similarly.

### A. **Plaintiff's Declarations Are No Basis For Conditional Certification Of A Collective Action**

Documents submitted to satisfy a plaintiff's burden at this early stage in FLSA litigation must, at the very least, be admissible under the most basic of evidentiary principles. "Courts . . . have repeatedly held that only admissible evidence may be considered in connection with a § 216(b) motion." *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865 (S.D. Ohio 2005) (citations omitted); *see also Richards v. Computer Scis. Corp.*, No. 3-03-CV-00630(DJS), 2004 WL 2211691, at *1 (D. Conn. Sept. 28, 2004) (finding motion to strike to be appropriate where documents were "not made on the basis of personal knowledge or contain inadmissible hearsay or conclusory statements"). Plaintiff's four cookie-cutter declarations fail this admissibility test.

Declarations submitted to support a motion for class certification must, at the very least, be based on personal knowledge[5] and consist of specific facts rather than conclusory allegations.[6]

---

[5] *West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *6 (D. Minn. July 10, 2006) ("averments made in support of a Motion for Conditional Certification must be based on personal knowledge . . . and 'unsupported assertions of widespread violations are not sufficient to meet the Plaintiff's burden'") (citations omitted); *Givhan v. Elec. Eng'rs, Inc.*, 4 F. Supp. 2d 1331, 1334 (M.D. Ala. 1998) (affidavits based on "information and belief" are insufficient as a matter of law) (citation omitted); *Landsberg v. Acton Enters., Inc.*, No. C2-05-500, 2006 WL 3742221, at *4 (S.D. Ohio. Dec. 15, 2006) ("While not all courts have agreed as to the requisite burden a plaintiff must meet in order to demonstrate that other employees are similarly situated, numerous decisions support the still-lenient position that limits consideration to admissible evidence in connection with conditional certification of a collective action."); *see also Richards*, 2004 WL 2211691, at *1 (determining that declarations must satisfy Rule 56(e) standard for summary judgment affidavits); Fed. R. Civ. P. 56(e) (affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated").

[6] *Wombles v. Title Max of Ala., Inc.*, No. 03 Civ. 1158CWO, 2005 WL 3312670, at *2 (M.D. Ala. Dec. 7, 2005) (in order to certify a class under § 216(b), plaintiff must make *substantial* allegations, meaning "*detailed* allegations supported by affidavits which successfully engage defendants' affidavits to the contrary") (citation omitted); *Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227, 1231 (S.D. Ala. 2003) (same); *Barten v. KTK & Assocs., Inc.*, No. 06 Civ. 1574T 27EAJ, 2007 WL 2176203, at *2 (M.D. Fla. July 26, 2007) (speculative,

The four declarations that Plaintiff submits in support of his motion contain statements made without personal knowledge and, other than the paragraphs providing each individual's name, employment dates, and work locations they contain nothing more than general, conclusory allegations.  Three of the declarations are otherwise verbatim duplicates of one another.  Only Plaintiff's declaration is somewhat distinctive – it contains fewer paragraphs than the other three and is not so bold in its suppositions as the other three.[7]  The declarations are completely lacking in probative value, are inadmissible, and this Court should disregard them in their entirety, as it rules on Plaintiff's motion.

"Cookie-cutter" declarations have been found inadmissible, or, at least, have been viewed suspiciously by many courts.  *Wombles*, 2005 WL 3312670, at *3-4 (collective action status denied because plaintiffs' five "nearly identical affidavits" were insufficient to demonstrate that other employees desired to opt in or that plaintiffs were similarly situated); *Smith v. Tradesmen Int'l, Inc.*, 289 F. Supp. 2d 1369, 1372 (S.D. Fla. 2003) (collective action certification not warranted because "the sole evidence . . . submitted by Plaintiff consists of three (3) identical affidavits by employees with different job titles, different job responsibilities, and who work in different geographic locations than Plaintiff"); *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 468 (7th Cir. 1998) (discrediting affidavits because they were identical); *Desert Sun Net LLC v. Kepler*, No. C06-1041P, 2006 WL 3091170, at *6 (W.D. Wash. Oct. 27, 2006) (courts

---

vague, and conclusory statements insufficient to justify certification of collective action under the FLSA).

[7] Plaintiff's declaration does not, for example, contain the belief-based supposition that "other SERCO civilian recruiters would want to join this case if they were to find out about it." (Declaration of Charles Ray Robinson, Jr., ¶ 10; Declaration of Johnny Smith, ¶ 10; Declaration of Elvin Delgado, ¶ 10).

give "little weight to such 'cookie cutter' declarations or to vague and conclusory assertions that some unidentified customers are having 'bad customer service experiences'").

Plaintiff's declarations may virtually be described as one and the same; they have such an indistinguishable quality that no credence reasonably should be given to them. *See Planned Parenthood*, 162 F.3d at 468; *Desert Sun Net LLC*, 2006 WL 3091170, at *6; *Tradesmen Int'l, Inc.*, 289 F. Supp. 2d at 1372. Furthermore, the declarations' superficial mimicry devalues the "factual" assertions that they contain to the extent that the declarations may be viewed to contain nothing more than conclusory allegations. Such allegations cannot justify an FLSA collective action. *See Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d 433, 435 (E.D. Va. 2002) ("Mere allegations will not suffice; some factual evidence is necessary."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Morales v. Plantworks, Inc.*, No. 05 Civ. 2349(DC), 2006 WL 278154, at *2-3 (S.D.N.Y. Feb. 2, 2006) (internal quotation and citation omitted) (conclusory allegation that "'[t]here are over 20 current and former employees that are similarly situated to Plaintiffs and have been denied minimum wage and overtime compensation while working for Defendants'" was insufficient); *Flores v. Osaka Health Spa, Inc.*, No. 05 Civ. 962VMKNF, 2006 WL 695675, at *3 (S.D.N.Y. Mar. 16, 2006) ("The plaintiff's determination to rely upon broad conclusory allegations and nothing more, also militates against certifying this as a FLSA collective action"); *Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983) (affirming district court's refusal to authorize class notice where the district "judge had before him only counsel's unsupported assertions that FLSA violations were widespread and that additional plaintiffs would come from other stores"); *Robinson v. Dolgencorp, Inc.*, No. 5:06-cv-122-OC-10GRJ, 2006 WL 3360944, at *5 (M.D. Fla. Nov. 13, 2006) ("a showing of similarity requires more than

generalized allegations"); *Wombles*, 2005 WL 3312670, at *2 (plaintiff must make substantial

and detailed allegations); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 363 (M.D. Ala. 1999)

(plaintiff must make "detailed allegations supported by affidavits.").

### B.  Plaintiff Has Failed To Demonstrate That He Is Similarly Situated To Other Potential Collective Members

Plaintiff seeks to represent a large and diverse group of potentially hundreds of military

recruiters who worked in diverse settings across the country, under different job titles, under

different contracts, under different pay plans, who were assigned different responsibilities and

acted autonomously with freedom to use their discretion to carry out their overall goals as they

saw fit.  These differences that exist among potential putative collective members in this case are

not differences without meaning.  Each of the following either directly impact Plaintiff's ability

to establish that such members are similarly situated to him and to one another or directly impact

this Court's ability to determine Serco's liability on a collective basis, or both.  Each justifies this

Court's denial of Plaintiff's motion.  *See Dionne v. The Ground Round*, No. 93-11083 RGS,

1994 U.S. Dist. LEXIS 21641, at *12 (D. Mass. July 6, 1994) (denying motion for certification

where putative class members worked in different states, for various supervisors, at different job

levels, and in different divisions and departments); *Belcher v. Shoney's, Inc*., 927 F. Supp. 249,

252 (M.D. Tenn. 1996).

### 1.     Potential Putative Members Worked In Different Job Titles

The roles and responsibilities of the potential plaintiffs differed depending on their job

title.  Serco employed six classes of military recruiters; each of the classes of recruiters

performed materially different duties.  For example, Military Recruiter Is were in training,

whereas Military Recruiter IIs worked autonomously and performed their job in a multitude of

different ways.  *See* Swartzentruber Decl. ¶ 19.  Military Recruiter IIIs were responsible for

recruiting and retention efforts involving Air Force, Navy and National Guard members.  *See id.*
Even within the position there were material distinctions in duties; for example, some were
responsible for developing market research to help aid future recruiting efforts, while others
recruited individuals on naval bases, and still others facilitated the move of a Guardsman to
another Guard location.  *See id.*

Military Recruiter Managers and Supervisors were directly involved in the management
of their companies or stations to differing degrees.  *See id.*  Each managed one or more recruiting
stations and supervised two or more other recruiters.  *See id.*  They made recommendations
toward hiring and firing the recruiters they supervised and they were expected to coach, mentor
and provide guidance to the subordinate recruiters.  *See id.* at ¶ 20.  Some had recruiting
responsibilities in addition to their managerial and administrative duties.  *See id.* at ¶ 19.  In
contrast, non-management recruiters exercised various duties that impacted the business
operations of their individual stations, of Serco generally, or of their clients, but did not supervise
other recruiters.  *See id.*

A simple high-level comparison of the various job titles at issue strongly suggests that the
putative class members are not similarly situated with respect to their duties.  Plaintiff's only
factual support for his allegation that he is similarly situated to other former Serco employees are
the inadmissible or incredible declarations of Charles Robinson, Johnny Smith and Elvin
Delgado, each of whom were employed by Serco as Military Recruiter IIs.  Plaintiff has
presented absolutely *no* admissible or credible evidence that he is similarly situated to any other
individual in any other job title.

## 2.    Potential Putative Members Worked Under Different Contracts

The duties of the potential class Plaintiff seeks to represent also varied depending on the
contract they were employed under.  During the limitations period, Serco employed recruiters to

work under five U.S. Military contracts to recruit and/or retain soldiers.  *See id.* at ¶ 5.  The goals and circumstances of the each contract caused the duties of Serco's military recruiters to vary widely.

For example, the mission of the Integrated Recruiter Contracts and the 10 Company Contract was to recruit individuals into the U.S. Army.  *See id.* at ¶¶ 8-10.  Each recruiter was free to determine who to recruit and the means to recruit them, which determined their daily job duties.  *See id.* at ¶¶ 31-36.  The goal of the Blue to Green contract was more specific. Recruiters working under this contract were ultimately responsible for recruiting active members of the U.S. Navy and U.S. Air Force to join the U.S. Army.  *See id.* at ¶ 11.  Although the end goal was the same, the recruiters' duties differed from those under the Integrated and 10 Company Contracts due to the population they were serving.  *See id.*  Since they were recruiting members that were already in the military, their focus was on retaining the members within the Department of Defense, rather than recruiting them.  *See id.*  Under the Arkansas Contract, recruiters again had a completely different focus.  Some were charged with transitioning soldiers from active duty into the Arkansas Guard, others facilitated the move of a Guardsman to another Guard location, still others developed research for market analysis purposes and did not recruit at all.  *See id.* at ¶ 12.

Beyond the differences in how the contracts' objectives affected the job duties of recruiters, each contract also dictated the formation of the station in which the recruiter worked, which, in turn, affected their duties.  *See id.* at ¶ 28.  Recruiters who worked under the Integrated Recruiter contracts were typically assigned to stations with no other Serco employees or, at most, one other Serco recruiter.  *See id.*  They worked in one of three general station formations: (1) they were the only recruiter assigned to a station, (2) they were assigned to a station with one or

more uniformed Army recruiters, or (3) they were assigned to a station with another Serco employee and the uniformed Army recruiter.  *See id.*  In contrast, under the 10 Contract Company Pilot Test contract, recruiters were assigned to stations with other Serco employees of varying levels of responsibility. *See id.*   For example, Plaintiff worked under both Integrated Recruiter Contracts at the Lexington East sub-station in Lexington, Kentucky.  *See id.*  He shared this station with no one and worked autonomously, as his supervisor was 110 miles away.  *See id.*  Conversely, under the 10 Contract Company Pilot Test contract, there were ideally seven Serco employees assigned to the Lancaster, Pennsylvania station, including Military Recruiters Is, IIs and a Military Recruiter Supervisor II.  *See id.*   Although some recruiters worked at stations with other Serco recruiters, they were expected to work autonomously and maintained their own recruit base.  *See id.*  Recruiters who worked in stand alone locations by themselves were responsible for ordering supplies for their station, and other administrative tasks that were shared by recruiters in larger stations.  *See id.* at ¶ 40.  The group dynamic also changed the nature of the recruiters' job because it invited an environment where recruiters could share ideas, suggestions and strategies relating to their stations' objectives.  *See id.* at ¶ 28.  Recruiters who worked in stations with other recruiters could team together on projects and/or brainstorm and problem solve together.  *See id.*   Such an environment further fostered mentoring relationships between the Supervisors and the Military Recruiter Is and IIs.   *See id.*

### 3.    Potential Putative Class Members Worked In Different Locations

Serco's recruiters had responsibility for "selling" the Army to individuals within a specific geographic area, but where recruiters worked significantly impacted how they did their jobs.  *See id.* at ¶ 26.   Serco assigned recruiters to approximately 175 recruiting stations nationwide.  *See id.* at ¶ 6.  Serco recruiters were assigned to work in over twenty-five states or territories and, therefore, a host of different markets.  *See id.*

Depending on the assigned area, the time they spent away from the office and the duties of the military recruiters were very different. *See id.* at ¶ 26. For example, a single military recruiter may have been assigned to much of Southern Utah, while another military recruiter may have been assigned to an area consisting of one zip code in greater Chicago, Illinois. *See id.* The military recruiter assigned to Southern Utah would have had a much larger area to cover and, therefore, would have spent most of his time away from his office, in his car, traveling to develop business in different areas of Utah. *See id.* Whereas, a military recruiter assigned to a city like Chicago, Illinois might have specifically targeted high school students at a local mall, community center or basketball court. *See id.* In some communities, advertising and promotions were more necessary than in others before person-to-person meetings took place. *See id.* There was no standard model for success, and the marketplace – the location of the recruiting station – governed, in large part, how a recruiter would succeed.

### 4. Potential Putative Members Worked Had Different Roles and Responsibilities

All of these differentiators impacted recruiters' roles and responsibilities. Each recruiter worked under very little oversight, set their own schedules and determined how they would obtain the enlistment commitments that they sought. *See id.* at ¶¶ 27, 30-37, 41. For example, David Swartzentruber was the direct supervisor for, on average, over one hundred recruiters under the Integrated Recruiter Contracts. *See id.* at ¶ 7. He typically had contact with the military recruiters he supervised once a week, but sometimes he would not talk to a recruiter for a month at a time. *See id.* at ¶ 29. When he did meet with his reports, he would not give them specific tasks, but would give general advice or specific advice on how to handle a recruit's unique situation. *See id.* As a result, the recruiters were free to determine how to perform their jobs and, therefore, the duties and responsibilities of recruiters varied widely.

24

Although the Army provided some Serco recruiters with a list of leads, each recruiter was expected to expand upon this list and solicit and develop new leads, indeed, their compensation was dependent on it. *See id.* at ¶ 31. They determined who to recruit to best meet their objectives. *See id.* Each had the discretion to select individuals, groups of individuals, and markets to recruit. *See id.* Recruiters could recruit individuals for the U.S. Army, U.S. Army Reserve, U.S. Army National Guard, or individuals for "special missions." *See id.* A special mission was the recruitment of doctors, nurses, linguists, ROTC candidates, special forces enlistments and individuals with civilian skills that the Army needed; for example, a plumber. *See id.*

The contract under which recruiter worked may have incentivized them to target a particular group of individuals or based on their own skill set, they may have chosen to target a particular group. *See id.* at ¶ 32. For example, some recruiters found that they made more money if they recruited people for "special missions." *See id.* Others targeted high school students or individuals with a military background. *See id.* The skills and approach required to recruit individuals for special missions are quite different from those needed to recruit high school students. *See id.* To recruit individuals for ROTC, for instance, a recruiter would need to be versed in the college matriculation process and the ROTC matriculation process. *See id.*

With each individual prospective recruit, each recruiter used his or her judgment to determine whether the individual was a qualified candidate and the level of interest of the potential recruit, and, therefore, whether to pursue the individual candidate. *See id.* at ¶ 33. The recruiter also determined if any impediments to enlistment existed, whether they were psychological, physical, legal or simply low test scores. *See id.* The recruiter had to use his or her judgment to determine how to handle impediments to enlistment (for example, determine

how to obtain a waiver of disqualifying law violations or recommend courses to raise test scores). *See id.* Each recruiter autonomously used his or her judgment to decide when and if to stop pursuing someone. *See id.*

Each individual recruiter determined the best way to develop leads in his or her particular geographic area and for his or her specific targets. *See id.* at ¶ 34. The recruiter used his or her judgment to determine the best way to prospect for recruits based on their market and the individual community. *See id.* Some recruiters prospected by cold calling potential recruits. *See id.* Others contacted potential recruits via their website, through e-mail or by contacting them on Facebook. *See id.* Still others decided that prospecting at a local high school or college was more advantageous. *See id.* Some specifically recruited on military bases. *See id.* Some worked solely off of referrals. *See id.* For example, a military recruiter in Puerto Rico might have received all of his business from referrals from family and friends because Puerto Rico is a very community based area, while a recruiter in greater Chicago may have gone door-to-door in ethnic enclaves or Section 8 housing developments. *See id.* Some recruiters worked almost entirely in their offices, relying on their ability to promote the Army as a sound career choice for a stable group of potential clients, though these recruiters would be in the minority. *See id.* Still others relied on "centers of influence" in their communities. *See id.* Centers of influence may have been educators, community leaders and other people who may have helped the recruiter identify individuals interested in enlisting in the Army. *See id.*

Each individual recruiter had discretion to determine who the people were who acted as the "centers of influence" in their specific communities, how to build relationships with those people, and whether they thought it would be productive to use the centers of influence to help develop leads. *See id.* at ¶ 35. The centers of influence varied depending on the market and the

26

area the recruiter was assigned to.  *See id.*  For example, depending on the community, a recruiter may have determined that the local football coach was a center of influence.  *See id.*  In another community, another recruiter may have determined that the local preacher was a center of influence.  *See id.*  The recruiter determined the best approach for building and cultivating relationships with the centers of influence based on the dynamics of the particular communities they served.  *See id.*  For instance, some recruiters, based on the dynamics of their specific market, chose to join local civic organizations in an effort to obtain more of a presence in the community.  *See id.*  Other recruiters decided to coach baseball to try to recruit individuals directly.  *See id.*

Each individual recruiter was responsible for managing their recruits from their initial meeting to the time they entered the Army, including getting the recruit to sign the contract to enlist, which was often signed in the recruiter's office.  *See id.* at ¶ 36.  Therefore, each recruiter determined how best to sell the service to the individuals, and no two recruiters did it the same way.  *See id.*  They had to determine how to motivate each individual recruit from the initial conversation through enlistment and past enlistment until the individual was sent to a training center.  *See id.*  Each recruiter determined his or her own unique sales approach.  *See id.*  For example, a recruiter with past military experience may have tried to recruit a former member of the U.S. Army for reserve duty by bonding over shared experiences.  *See id.*  Another recruiter who targeted high school students may have presented the Army as an opportunity to make money for college or to develop a trade.  *See id.*

All applicants without prior military service entered the Delayed Entry Program ("DEP") in the Army, also called the Future Soldier Training Program, which was a holding point for applicants who would later ship to the training center upon completion of the DEP period.  *See*

*id.* at ¶ 37.  The length of each recruit's stay in this program varied depending on the need of the Army and the position the recruit accepted within the Army.  *See id.*  Sometimes recruits remained in the DEP for more than one year prior to reporting to basic training.  *See id.*  Each recruiter, therefore, had to develop creative ways to maintain a recruit's interest throughout the delay period.  *See id.*

Each recruiter also had to problem solve but the problems recruiters faced varied depending on their goals and the population they targeted.  *See id.* at ¶ 38.  For example, if a recruit became pregnant during this period, the recruiter would work with the potential soldier to determine the best option for her and her family. *See id.*  Or, if a high school student was delayed until he finished high school but was in jeopardy of not graduating, the recruiter had to determine how to encourage him to get his grades up, whether it be through contact with the parents, a baseball coach, or through a tutor.  *See id.*

Each recruiter was responsible for managing their own costs and expenses associated with recruiting applicants for the Army.  *See id.* at ¶ 39.  They each had the discretion to determine how to manage their costs.  *See id.*  For example, one recruiter may allocate part of his budget to presenting at a local community college, while another recruiter may decide to promote the Army by walking in a Fourth of July parade and handing out marketing materials. *See id.*  Each recruiter had to determine how best to allocate his or her resources. *See id.*

Given the varying roles and responsibilities of recruiters throughout the country and the freedom they were given to determine how to reach their ultimate goals, it would be impossible to categorically determine if all were correctly classified as exempt, as Plaintiff is asking this Court to do.

### 5.     Potential Putative Members Were Paid Differently

Each of the military recruiter positions were paid a base salary plus commissions, but their pay varied depending on a number of factors, including position, location, supervisor or manager, contract, bonus plan, market, the needs of the Army or the Arkansas Guard and their own personal goals.  *See id.* at ¶¶ 21-24.  For instance, as a recruiter progressed through the various levels of military recruiter positions, they were paid more at each step in the progression. *See id.* at ¶ 21.

Likewise, company managers set their own standard operating procedures for the company and had the discretion to develop an alternative pay plan and bonus plan for subordinate recruiters in order to meet the short term and long term objectives of their company, their client and Serco.  *See id.* at ¶¶ 19, 22.  For example, the command manager over the North Carolina stations determined that due to an increased amount of interest in the armed services in that market, recruiters would work harder for an increased base rate of pay, rather than an increased commission amount.  *See id.* at ¶ 22.  Likewise, the command manager over the Illinois locations constructed an alternative pay plan due to the conditions of the local market. *See id.*

Each contract had its own commission and pay structure.   Under each contract, different incentives were offered to help meet the particular needs of the Army or National Guard at the time in the particular location.  *See id.* at ¶ 32.  For example, some recruiters were incentivized to recruit doctors for special missions while other in a certain area were incentivized to recruit for the Army Reserve because there were reservist vacancies in that area of the country.  *See id.* at ¶¶ 31-32.  As commissions was a large part of recruiters' compensation, the compensation of recruiters varied based on the individual motivation of the recruiter and their ability to meet the end goal. *See id.* at ¶ 24.

6.       **Potential Putative Members Worked Different Hours**

Serco's military recruiters were responsible for setting their own schedules.  *See id.* at ¶ 41.  As a result, the hours of Serco's military recruiters varied, depending on the contract, their location, the community they served, the size of command and each individual's own willpower and motivations.  Some days, some of Serco's military recruiters may have worked long hours, other days they may not have even come to work.  *See id.*  Some recruiters chose to work from home on occasion, while others did not.  *See id.*

In light of the lack of evidence Plaintiff has set forth in support of conditional certification, this Court should not expose Serco to the burdens and costs necessarily imposed by Plaintiff's fishing expedition.  *See Dreyer v. Altchem Environmental Servs., Inc.*, No. 06-2393(RBK), 2006 U.S. Dist. LEXIS 93846, at *6-*8 (D.N.J. Dec. 12, 2006); *Armstrong v. Weichert Realtors*, No. 05-cv-3120(PGS), 2006 U.S. Dist. LEXIS 31351, at *4-*5 (D.N.J. May 19, 2006)(denying preliminary certification where supporting declaration made vague, general statements about other employees but failed to define those to whom the affiant referred and how he had knowledge of them).

V.    **A Collective Action Would Not Be Manageable Under These Circumstances**

In determining whether to grant conditional certification, courts examine whether a manageable collective action exists. *See Crawford,* 2007 WL 293865 at *6.

A. **The Putative Collective Is Too Geographically Dispersed To Adjudicate This Action On A Collective Basis**

Factors courts consider in determining whether a manageable collective action exists include whether the potential class is too large or geographically displaced to be considered unmanageable.  *See Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 896-897 (N.D. Iowa 2008)(granting conditional certification where potential class worked at one facility); *Owens v.*

*Southern Hens, Inc.*, No. 2:07-cv-28-KS-MTP, 2008 U.S. Dist. LEXIS 34817 at *3 (S.D. Miss. Mar. 17, 2008) (noting that all potential plaintiffs are employees at a single facility).  Plaintiff has failed to show that any common policy exists that is applied throughout each of the recruiting stations at which Serco provided recruiters.  Therefore, this court would have to examine the duties of each recruiter at each of the 175 locations.  This alone makes this action unamenable to collective treatment.

### B.  Collective Treatment Would Be Inappropriate Due To The Inherent Conflict Among Potential Class Members

Plaintiff defines the collective that he seeks to represent as including all of Serco's military recruiters.  He does not distinguish among recruiters who worked in management and supervisor positions from those whom they supervised – Military Recruiters I, for example, and the Military Recruiter Supervisors or Military Recruiter Managers, who – in some locations – would have overseen their work.  As should be self-evident, the duties performed by subordinate recruiters, the hours that they worked, and the amounts of time they devoted to office work, contract procurement, administrative work, and the similar duties would all be potentially impacted by the management styles of the supervisors and managers who oversaw their work. *See* Swartzentruber Decl. ¶ 21.  On the other hand, testimony from subordinate recruiters could be used to establish or disprove the applicability of the administrative and executive exemptions to their supervisors.  An inherent conflict thus exists between groups of employees whom Plaintiff would include in his collective, and conditional certification is therefore inappropriate. *See White v. Osmose*, 204 F. Supp. 2d 1309, 1314-15 (M.D. Ala. 2002) (ruling that it would be improper to include foremen and the crews they might have supervised in an FLSA collective action because of the supervisor / subordinate relationship and the inherent conflict of interest between them); *see also Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas*

*Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (rejecting a named plaintiff with a conflict of interest in Rule 23 class action); *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997) (plaintiffs lacked same interest as class members).

### C.  The Applicable Exemptions That Apply Would Force This Court To Examine The Individual Duties Of Each Recruiter, Thus, Making This Action Unmanageable As A Collective Action

Contrary to what Plaintiff suggests, the classification of a group of employees as exempt, that is not facially improper under the FLSA, cannot be a "policy, plan or scheme" that supports a § 216(b) claim.[8]  *See Morisky*, 111 F. Supp. 2d at 498 (decision to classify positions as exempt, not "improper on its face," is not a common "plan or scheme" on which to base conditional certification).  Plaintiff has not and cannot meet his burden of showing that he is similarly situated to a class of military recruiters by simply alleging that all putative class members were classified as exempt employees.  Moreover, Plaintiff has not shown that Serco's classification of all military recruiters as exempt violates the FLSA.

If each potential putative collective member were examined, this Court would find that some were exempt pursuant to the outside sales exemption, some pursuant to the administrative exemption, some pursuant to the executive exemption, and some pursuant to the highly compensated employee exemption. *See* 29 C.F.R. § 541.500(a)(1); 29 C.F.R. § 541.200 (2004); 29 C.F.R. §§ 541.1(f), 541.119; 29 C.F.R. § 541.601.  A categorical determination of whether each member was properly classified would be impossible, as the facts underlying each person's exemption would have to be individually examined.  *See Icicle Seafoods, Inc. v. Worthington*,

---

[8] For instance, a facially invalid classification might be the categorical treatment of janitors as exempt executives.  *See Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004). That is far from the scenario presented in this case.

475 U.S. 709, 714 (1986) (it is the district court's obligation to examine the facts that support the legal conclusion that an employee is exempt from the FLSA's overtime requirements).

While there are a host of rulings across the country that have approved a district court's close examination of the propriety of an FLSA exemption at this stage of § 216(b) litigation, Serco is not seeking a summary judgment-like ruling that the employees at issue in this case are exempt.[9]  To the contrary, Serco asks this Court to contemplate the sundry factual and legal determinations that will have to be made in this case because of the exemptions that the evidence would prove apply to individuals, clusters, and categories of employees, depending on their locations, work performed, titles occupied, and the host of other factors cited above.  *See* Declaration of David Swartzentruber.  The uncategorical analysis of individuals and the exemptions that would apply to them, would make this litigation a nightmare to manage on a collective basis.[10]

---

[9] Examining the factors stated in Defendant's opposition brief, this Court could conclude that most, if not all, of the military recruiters employed by Serco qualified for either the outside sales, administrative, executive or highly compensated exemptions.  *See Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008).

[10] Recognizing the difficulty inherent in allowing exemption cases to proceed on a collective basis, numerous courts have refused to certify collective actions under similar circumstances. *See Morisky*, 111 F. Supp. 2d at 499 (concluding that "[t]he exempt or non-exempt status of potentially hundreds of employees would need to be determined on . . . an employee-by-employee basis" and the "individual nature of the inquiry" to determine exempt status of plaintiffs makes "collective treatment improper"); *Aguirre v. SBC Commc'ns, Inc.*, No. Civ.A.H-05-3198, 2006 WL 964554, at *7 (S.D. Tex. Apr. 11, 2006) (citing cases); *Holt*, 333 F. Supp. 2d at 1271 (exemption required "fact-intensive determination" and examination of employees' day-to-day tasks); *Dean v. Priceline.com, Inc.*, No. 3:00CV1273 (DJS), 2001 U.S. Dist. LEXIS 24982, at *7 (D. Conn. June 5, 2001) (same); *Donihoo v. Dallas Airmotive, Inc.*, No. Civ.A.3:97-CV-0109-P, 1998 WL 91256, at *1 (N.D. Tex. Feb. 23, 1998) ("[i]nquiry into the employee's specific job duties . . . is not appropriate in a class lawsuit."); *Diaz v. Elec. Boutique of Am., Inc.*, No. 04-CV-0840E(SR), 2005 WL 2654270, at *3 (W.D.N.Y. Oct. 17, 2005) (determination of exempt status requires a detailed factual analysis of each plaintiff's daily activities); *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1014 (N.D. Ind. 2005) ("[l]iability depended on an individual determination of each employee's duties."); *Young v. Cerner Corp.*, 503 F. Supp. 2d

**VI.**     <u>Any Notice To Potential Opt-In Plaintiffs Must Be Supervised By The Court</u>

       Plaintiff's proposed "Notice" to putative collective action members contains numerous

statements that are factually inaccurate, confusing or misleading and misstates applicable law.

For example, the notice:  (1) lacks information about Serco's denial of the allegations; (2)

contains misleading information suggesting that putative collective action members may lose

certain rights if they fail to join the lawsuit; (3) fails to mention that potential putative collective

members are not required to be represented by Plaintiff's attorneys; (4) fails to mention that

putative plaintiffs may be liable for "costs" in the event they are unsuccessful in this lawsuit; (5)

fails to inform potential putative collective members that they will be required to fully participate

in discovery and any trial in this matter; (6) fails to inform that Serco will have to turn over

personnel files, evaluations, resumes, applications and other personal information in its

possession; (7) fails to identify counsel for Serco; and (8) fails to provide a deadline by which

putative class members must file an opt-in consent form. *See, e.g., Armstrong v. Weichert

Realtors*, No. 05-cv-3120(PGS), 2006 U.S. Dist. LEXIS 54230, at *7 (D.N.J. Aug. 4, 2006)

(noting that opt-in plaintiffs can "bring their own individual claims"); *Reab v. Elec. Arts, Inc*.,

214 F.R.D. 623, 630 (D. Colo. 2002) (requiring that notice include statement of discovery and

trial responsibilities); *Gjurovich v. Emmanuel's Marketplace, Inc*., 282 F. Supp. 2d 101, 107-08

(S.D.N.Y. 2003) (requiring plaintiff to add contact information for defense counsel and adding

language that opt-in plaintiffs may be liable for costs associated with suit and potential

counterclaims that defendants may assert).  If any FLSA class is conditionally certified and

---

1226, 1233 (W.D. Mo. 2007).  Plaintiff's brief ignores the inescapable fact that the differences
among recruiters' individual circumstances clearly predominate over any similarities.  His
allegations simply cannot support a collective action, which in this case, is not superior to
individual trials on potential claims.

defined, the notice issued to potential plaintiffs in this complex case should be a matter of negotiation and further Court approval.  *See Hoffmann*, 493 U.S. at 170-74.  To date, the parties have not engaged in any discussions regarding the terms of the notice.  Accordingly, it is inappropriate for Plaintiff to specify any substantive terms of the notice at this time.

Respectfully submitted this 15th day of July, 2009.

<u>s/ Brett C. Bartlett</u>
SEYFARTH SHAW, LLP
LEAD COUNSEL FOR DEFENDANT
Brett C. Bartlett (*admitted pro hac vice*)
Heather Havette (*admitted pro hac vice*)
1545 Peachtree St. N.E.
Suite 700
Atlanta, Georgia 30309
Tel:    (404) 885-1500
Fax:    (404) 892-7056
LOCAL COUNSEL FOR DEFENDANT
DINSMORE & SHOHL, LLP
Barbara B. Edelman
250 West Main Street,
Suite 1400
Lexington, Kentucky 40507
Tel:    (859) 425-1010
Fax:    (859) 425-1099

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and accurate copy of the foregoing DEFENDANT'S

OPPOSITION TO PLAINTIFF'S MOTION FOR NOTICE TO POTENTIAL PLAINTIFFS

AND CONDITIONAL CERTIFICATION has been filed with the Clerk of Court using the

CM/ECF system which will automatically send email notification of such filing to the following

attorneys of record on July 15, 2009:

> Jeremi K. Young
> THE YOUNG LAW FIRM, P.C.
> 112 West 8th Avenue, Suite 900-D
> Amarillo, TX 79101
>
> Tim Newsom
> LOVELL, LOVELL, NEWSOM & ISERN, L.L.P.
> 112 West 8th Avenue, Suite 1000
> Amarillo, TX 79101


> <u>s/Brett C. Bartlett</u>
> Attorney for Defendant